**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10 C 7860 |
| ) | |
| DERRICK SHAREEF, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Derrick Shareef has moved the Court pursuant to 28 U.S.C. § 2255 to vacate his conviction for attempted use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2)(D). The indictment alleged that Shareef attempted to use explosive devices to attack the CherryVale Shopping Center in Rockford, Illinois. Shareef pled guilty and was sentenced by Judge David Coar to a thirty-five year prison term. In his section 2255 motion, Shareef asserts that his attorneys rendered constitutionally ineffective assistance in violation of his Sixth Amendment rights.

In a previous decision, the Court denied Shareef's motion in part and ordered the government to submit additional evidentiary materials in support of its position. *See United States v. Shareef*, No. 10 C 7860, 2011 WL 1838876 (N.D. Ill. May 13, 2011). The Court assumes familiarity with that decision, which provided a brief summary of the relevant facts and procedural history. The government and Shareef have both filed additional briefs and exhibits. For the reasons stated below, the Court now denies the

remainder of Shareef's motion.

## Discussion

Shareef's sole remaining ineffective assistance claim involves the failure of his second attorney, Donald Young, to file a motion to withdraw Shareef's guilty plea and advance defenses of entrapment and sentencing entrapment. In considering this claim, the Court applies the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires Shareef to make a two-part showing. First, Shareef must demonstrate that Young's performance was deficient—specifically, that it "fell below an objective standard of reasonableness." *Id.* at 688. The Court must make "every effort . . . to eliminate the distorting effects of hindsight" and will therefore "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. Second, Shareef must show that he was prejudiced by Young's deficient performance. To do so, he must demonstrate "a reasonable probability that, but for [Young's] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Regarding deficiency, Shareef must show that Young unreasonably concluded that Shareef's entrapment defense was weak and advised Shareef not to withdraw his guilty plea. "Where a defendant offers a defense of entrapment, the government must prove either that it did not induce the defendant to commit the crime, or that the defendant had a predisposition to commit the crime." *United States v. Lewis*, 641 F.3d 773, 781 (7th Cir. 2011). Facts relevant to predisposition include "(1) the defendant's character or reputation; (2) whether the government suggested the criminal activity; (3)

-2-

whether profit was involved; (4) whether reluctance was expressed which was overcome by government persuasion; and (5) the nature of the inducement or persuasion." *Id.* Although none of these factors is dispositive, "the central question is whether the defendant showed reluctance to participate in the crime." *Id.*

The government contends that Young's decision not to advise Shareef to withdraw his guilty plea and raise an entrapment defense was a reasonable strategic judgment in light of the evidence. Pl.'s Supplemental Resp. (Pl.'s Supp.) at 15. In support, it cites documents and multimedia evidence taken from Shareef's computer; reports of government agents' interviews with Shareef and other individuals; and transcripts of recorded conversations between Shareef and a confidential informant.[1] *See generally id.* at 7-15, Exs. A-V. Shareef counters that the government "failed to point out in its submissions whether Mr. Young had investigated" Shareef's allegations of entrapment before advising Shareef not to withdraw his plea. Def.'s Supplemental Reply (Def.'s Supp.) at 4. He also asserts that the evidence shows that he was not predisposed to commit a terrorist act but rather that he attempted to do so only in response to the informant's coercive comments and actions. *See generally id.*

1. **Shareef's motion to appoint counsel**

As an initial matter, Shareef has filed a renewed motion to appoint counsel to perform discovery on his behalf pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings. Docket no. 31. Shareef filed a virtually identical motion on June 28,

---

[1] The Court previously issued orders placing the government and Shareef's supplemental materials under seal. *See* docket nos. 20, 29. Consistent with those orders, the Court will not refer to this informant or any other witnesses by name.

2011, which the Court denied.  See docket nos. 25, 26.

The Court denies Shareef's renewed motion.  As discussed below, the record is sufficiently developed for the Court to resolve Shareef's ineffective assistance claim.  Moreover, as the Court noted in its order denying Shareef's last motion to appoint counsel, the quality of Shareef's submissions over the course of this case demonstrates that Shareef was capable of presenting his claim and responding to the government's arguments without the assistance of counsel.  See docket no. 26.  Therefore, the Court declines to appoint counsel for Shareef or order additional discovery before ruling on his section 2255 motion.  See Pruitt v. Mote, 503 F.3d 647, 657 (7th Cir. 2007) ("[D]ue process does not require appointment of counsel for indigent prisoners pursuing . . . federal habeas relief"); see also Barry v. United States, 528 F.2d 1094, 1101 (7th Cir. 1976) ("[T]he scope of discovery to be allowed in a collateral attack upon a conviction lies in the discretion of the district court.").

**2.      Young's investigation of Shareef's entrapment defense**

Turning to the merits, Shareef contends that the government "failed to point out in its submissions whether Mr. Young had investigated any of Mr. Shareef's allegations of being entrapped by the government's paid [informant], before advising him to continue on with his guilty plea."  Def.'s Supp. at 4.  The government, by contrast, argues that Shareef "has presented no evidence rebutting Mr. Young's representation that he investigated the case file."  Pl.'s Supp. at 15.

There is evidence in the record indicating that Young diligently investigated Shareef's entrapment defense before advising him not to withdraw his guilty plea.

Documents filed by both sides indicate that Young had possession of evidentiary materials that the government produced to Shareef following his indictment. *See, e.g.*, Shareef Decl., Ex. 12 (letter from Michael Mann, Shareef's former attorney, to Shareef) ("All your voluminous discovery was turned over to [Young] when you told me that you wished to try to vacate your plea."); Pl.'s Supp., Ex. D-1 (January 25, 2007 letter from AUSA John Ryan to Mann confirming the government's production of documents and electronic discovery labeled G0001-G0296). Shareef also made clear in his declaration submitted in the present case that he "fully advised" Young of the facts underlying his purported entrapment defense. Shareef Decl. ¶ 32. Finally, at Shareef's sentencing hearing, Young informed Judge Coar that he had "read a whole lot of information," including "all of the pleadings, all of the filings, the affidavits, the proffers that [Shareef] had given, the witness 302's, [and] hours and hours of transcripts." Sentencing Tr. 12:3-8.

Shareef offers no evidence rebutting these facts or otherwise supporting his allegation that Young "failed to properly investigate the record." Def.'s Supp. at 3. Instead, he simply asserts that "there exist[s] nothing in the record that reveals that Mr. Young did any investigation." *Id.* This argument lacks merit for two reasons. First, Shareef's bare allegation that Young performed a deficient investigation is insufficient to rebut the above evidence, which suggests that Young did review the evidence the government had produced to Shareef. Second and perhaps more importantly, it is Shareef, not the government, who bears the burden of proving that Young's conduct in this regard was deficient. *Strickland*, 466 U.S. at 688; *see also Eady v. Morgan*, 515 F.3d 587, 599 (6th Cir. 2008) ("[Petitioner] points to the fact that the government has

not provided proof that [his attorney] did investigate, but [petitioner] is the one who must point to his own proof to show that [counsel] did not investigate."). Therefore, Shareef has not shown that Young's performance was deficient based on a failure to investigate the facts underlying Shareef's purported entrapment defense.

### 3. Evidence of predisposition

Next, the government argues that Young reasonably determined Shareef's entrapment defense to be weak because "the evidence shows [Shareef's] desire to commit terrorist attacks before he met the informant," as well as "a complete absence of any reluctance to commit the crime for which [he] was convicted." Pl.'s Supp. at 7. Shareef counters that "there was evidence in the record that would have supported [his] allegations that he had been entrapped and coerced by the . . . informant." Def.'s Supp. at 2. In light of this evidence, Shareef contends, it was unreasonable for Young to advise Shareef to continue with his guilty plea.

The record contains ample evidence that Shareef was predisposed to commit terrorist acts prior to meeting the government's informant in September 2006. First, a number of documents recovered from Shareef's computer indicate that he was, at a minimum, keenly interested in terrorist activity. These include amateur videos depicting suicide bombings and rocket attacks targeting U.S. military forces in Iraq. *See generally* Pl.'s Supp., Ex. G. Shareef saved each of these videos to his computer's hard drive in July 2006, two months before he met the informant. *See id.* The record also contains a July 28, 2006 e-mail from Shareef to another target of the government's investigation, Hassan Abu-Jihaad, which contains a veiled reference to violent acts.

*See id.*, Ex. H. The e-mail, which Shareef sent under the subject line "A poem for the believers," reads as follows:

> Respect is earned its never givin [sic], feeling like im dead when I sit. Better livin' - awaits those who strive with their wealth and blood, - but the blood is only spilled for the ones I love. - Allahu Akbar, echoes through the back of my mind - trapped in a time when brothers sit back, relax and recline - *I'd rather . . . clap with the 9 than be laughed at for lying - and make salaah in Paradise with those not afraid of dying.*[2]

*Id.* (emphasis added). Although the videos and the e-mail do not, by themselves, show that Shareef had specific plans to engage in terrorism, they nevertheless suggest that he had a preoccupation with terrorism and violence before he met the informant.

Additionally, Shareef's recorded statements to the informant strongly suggest that he had a preexisting desire to plan and execute a terrorist attack. In a December 1, 2006 conversation with Shareef, the informant asked Shareef "if you never would [have] met me, would you have ever done somethin' like this?" Pl.'s Supp., Ex. D-4 at 16. Shareef's lengthy and virtually uninterrupted response was as follows:

> I wouldn't [have] had the resources to do nothin' like this, *but I probably would've eventually ended up just stabbin' the s— out of some Jews or somethin'. . . .* Just stabbin' them n-----s with a steak knife, dude, I ain't gonna lie, 'cause . . . durin' that war with Hezbollah,[3] *I had already started to look at synagogues out here in, in the DeKalb area and everything . . .* I was clickin' at synagogues, I was doin' MapQuest,[4] I was lookin' at s— . . .

---

[2] In the vernacular of rap music, the term "9" refers to a nine-millimeter handgun. *See, e.g.*, Project Pat, *Nine To Yo Dome*, on *Underground Vol. 2: Club Memphis* (Smoked Out Records 1999).

[3] During the summer of 2006, a military conflict occurred between Israel and Hezbollah, a Lebanese militant group and political party. *See Mekhael v. Mukasey*, 509 F.3d 326, 327-28 (7th Cir. 2007).

[4] MapQuest is a popular website that provides addresses, maps, and satellite images of locations throughout the United States. *See* www.mapquest.com.

> . I was gettin' tired of them yahoos. I was like, man, it's goin' down. . . . I found like two synagogues in DeKalb, one of 'em was down a block from the [mosque]. I knew that they do the[ir] thing on Saturdays, right? . . . I was like, I'm gonna lay low out there. I'm gonna just camp out, go overnight, be out there Friday night, or Saturday morning about twelve, one o'clock, I'm gonna be there and then as soon as I see them fools goin' in the buildin', I had planned on tryin' to grab one of 'em . . . *I was just gonna go over there and try and shank one of 'em, at least two of 'em.*

*Id.* at 16-17 (emphasis added). Put simply, Shareef admitted that he plotted an attack on innocent civilians prior to meeting the informant. The fact that Shareef made these plans during the summer of 2006 strongly suggests that his interest committing violent acts of terrorism at that time, as evidenced by the files found on his computer, was not merely the product of morbid curiosity or "bad taste." Def.'s Supp. at 9. Moreover, statements made by Shareef's mother further corroborate the seriousness of his comments. During an interview with government agents on December 9, 2006, she said that she "noticed a change in Shareef when the recent Israeli/Hezbollah conflict began" and overheard Shareef saying things about the war that upset her, including anti-Jewish comments. Pl.'s Supp., Ex. K at 3.

Evidence the government obtained from Shareef during proffer interview sessions also suggests that Shareef's radicalization occurred long before his encounters with the informant. For example, during an interview on December 12, 2006, Shareef told government agents that about four years before his arrest, he had a conversation with Abu-Jihaad in which Abu-Jihaad mentioned the general possibility of attacking military personnel in San Diego, California. *Id.*, Ex. M at 1. Although Abu-Jihaad and Shareef did not engage in detailed planning for such an attack, they "did speak about attacks on military installations in general terms." *Id.* Shareef further

admitted to the agents that Abu-Jihaad "never talked about attacks *in the level of detail that Shareef did.*" *Id.* (emphasis added).

Finally, other statements that Shareef made to the informant reveal that he did not simply follow the informant's suggestions but instead devised attack plans of his own. For example, on November 29, 2006, the informant asked Shareef what sorts of attacks he wanted to undertake. *Id.*, Ex. V-1 at 4. In response Shareef said "I'm on some city hall type stuff right now. Federal court houses." *Id.* After the informant said he wasn't sure whether Shareef was serious, Shareef elaborated:

> SHAREEF: [T]he courthouses in DeKalb, where do I be goin' every month. Them n-----s weak as hell. You go in there, you clap the first three n-----s at the door that they got and you up in there, you know what I'm sayin'. Man, everything else it's gonna have to be tactical . . . . But I just want to smoke a judge.
>
> INFORMANT: There's no specifics of what you want to do?
>
> SHAREEF: No, like specifically, I would love to hit the, uh, the DeKalb Sycamore County court house.

*Id.* at 4-5. Similarly, during a conversation on with the informant on December 5, 2006, Shareef suggested that it would be a good idea to fire a rocket-propelled grenade a low-flying commercial airliner. *Id.*, Ex. P-1 at 84-86. Shareef reasoned that

> All the planes that fly over here that be landin' already got their wheels down. You hit one of 'em at that close range, dude, it's blowin' up. It ain't makin' it to the runway. And they not gonna have any idea at this point what the hell happened. They're not gonna know if it was a bomb onboard . . . They ain't gonna know what it was, dude. It ain't gonna be no warning.

*Id.* at 85-86. Shareef also asked the informant to obtain rocket-propelled grenades from his purported arms dealer. *Id.* at 85.

Although these conversations occurred after Shareef met the informant, they show that Shareef was actively generating violent ideas of his own, a fact that is consistent with—as well as corroborative of—the predisposition evidence discussed above. Shareef contends that his various inculpatory statements to the informant were merely "boasting and bragging," Def.'s Supp. at 11, but he has offered no evidence substantiating this allegation. To the contrary, based on the Court's review of the transcripts of these conversations and the corresponding audio recordings, Shareef appears to have been quite serious when he expressed his desire to attack various civilian targets. In short, Shareef has not plausibly rebutted the government's evidence of predisposition.

The Court acknowledges that Shareef has presented some evidence suggesting that the government's informant may have pressured him to participate in terrorist activity. In particular, government's submissions reflect one occasion on which the informant appears to have threatened to hurt or kill Shareef if he withdrew from the CherryVale Mall bombing plot. See Pl.'s Supp., Ex. D-4 at 44 ("You change your mind, I'm slicin' your throat my damn self, practically."). The government characterizes this comment as a joke. See Pl.'s Supp. at 6. Shareef also cites a government summary of a November 30, 2006 conversation in which the informant purportedly told Shareef that he would commit suicide if Shareef decided not to participate in the attack. See Def.'s Supp., App. D at 4. The government offers no response on this point. Finally, Shareef alleges that the informant made an unspecified number of other vague threats against him, such as "you better not back out on me." See, e.g., Shareef Decl. ¶ 11.

The informant's threatening comments are evidence that could be used to

support an entrapment defense.  Inducement and the absence of predisposition, however, are separate (though overlapping) elements of an entrapment defense.  *See Lewis*, 641 F.3d at 781 (emphasis added) (to defeat an entrapment defense, "the government must prove *either that* it did not induce the defendant to commit the crime, *or* that the defendant had a predisposition to commit the crime"); *United States v. Bek*, 493 F.3d 790, 800 (7th Cir. 2007) (emphasis added) (entrapment requires "(1) that the government induced [the defendant] to perform the crime, *and* (2) that he was not predisposed to engage in the criminal conduct.").  In other words, if Young reasonably determined that there was evidence on inducement that was favorable to Shareef, but that the evidence on predisposition was highly unfavorable, it would be eminently reasonable for Young to advise Shareef not to withdraw his guilty plea.  In this regard, the Court is not simply hypothesizing a rationale for Young's actions but rather relies on his statement to Judge Coar regarding his investigation as well as the undisputed evidence regarding the information that Young had.

As discussed above, the government has identified a substantial amount of evidence tending to show that Shareef was predisposed to commit terrorist attacks prior to meeting the government's informant.  Although other evidence may be read to suggest that the informant pressured Shareef to follow through with the attack on the CherryVale Mall, it was reasonable for Young to conclude that the compelling predisposition evidence likely would have rendered futile any effort to advance an entrapment defense.

Moreover, Shareef's proffered evidence regarding inducement is not particularly strong.  Although he asserts that the death threat contained in the record "is only one of

many threats that the [informant] had made," Def.'s Supp. at 6, Shareef offers no other evidence corroborating this allegation.  In addition, the informant offered Shareef several opportunities to back out of the plot or voice any reservations he may have had about participating in it.  Shareef did not express a hint of reluctance on any of these occasions.  *See, e.g.*, Pl.'s Supp., Ex. P-1 at 15 (Informant:  "I just wanna make sure since, you know, me and you got kickin' it, I'm not the reason you're doin' this." Shareef:  "No, man."  Informant:  "'Cause I feel bad, you know, if you don't wanna do it and then I put the motivation"); *id.* at 20 (Informant:  "You'll probably go home, see [your] mom and change your mind."  Shareef:  "I know.  Not even come back to the crib or nothin'."  Informant:  "Are you serious?"  Shareef:  "No, man.  [Unintelligible]" Informant:  "Man, if you're serious, let me know now, Ak."  Shareef:  "Negative."); *id.* at 54 (Informant:  "I mean, are—if, you're not havin' no second thoughts, though.  'Cause I don't want you backin' out the last minute.  You know what I'm sayin'?  So, you for sure?"  Shareef:  "I'm for sure, man.").

In light of all this evidence, Shareef has failed to show that it was unreasonable for Young to conclude that an entrapment argument was unlikely to succeed at trial.

 4. **Summary**

Evidence obtained by the government from multiple sources, including Shareef himself, indicates that Shareef was interested in participating in violent attacks well before he met the government's informant.  Therefore, Young acted "within the wide range of reasonable professional assistance" when he determined that a jury likely would find that Shareef was predisposed to commit terrorist acts and advised Shareef

against withdrawing his guilty plea to present an entrapment defense. *Strickland*, 466 U.S. at 689. Because Young's performance was not deficient, the Court need not consider whether Shareef has satisfied *Strickland*'s prejudice element.

## Conclusion

For the reasons stated above, the Court denies defendant's motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255 and his renewed motion to appoint counsel to perform additional discovery [docket no. 31]. The Clerk is directed to enter judgment in favor of the United States and against defendant.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 11, 2011